**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **SUSAN MACK**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**LEXISNEXIS RISK SOLUTIONS**,<br><br>Defendant. | INDEX NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

**PLAINTIFF'S CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Susan Mack ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant, LexisNexis Risk Solutions, ("LNRS" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach") and is brought on behalf of all persons who entrusted Defendant to hold in its possession certain personally identifiable information ("PII", collectively, the "Private Information"), the putative class members ("Class"). This Data Breach occurred on or around December 25, 2024, and was reported on May 24, 2025.

2. According to Defendant's report to the The Office of the Maine Attorney General,

364,333 individuals' sensitive data was compromised.[1]

3. As one of the largest data brokers in the country, Defendant possesses an extensive amount of Plaintiff's and the Class Members' PII.

4. This Private Information included but is not limited to "name, contact information, Social Security number, Driver's License number and date of birth" *See* Notice of Data Breach, attached hereto as Exhibit A.

5. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiff and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

6. Yet, on December 25, 2024, an unauthorized third-party acquired certain data belonging to Defendant from a third-party platform used for software development.[2]

7. The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

8. The Data Breach resulted from Defendant's failure to implement these obligatory adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for entering into a contract for use of Defendant's services.

9. The full extent of the types of sensitive personal information, the scope of the breach, and the root cause of the Data Breach is all within the exclusive control of Defendant and

---

[1] The Office of the Maine Attorney General *available at* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4bc2-8792-a1252b4f8318/782e2159-f2d4-4394-8d03-51bf08a6b3e5.html (*last accessed* June 6, 2025).
[2] *See* Exhibit A

its agents, counsel, and forensic security vendors at this phase of litigation.

10. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Defendant, through its employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

11. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

12. Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

13. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information,

filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14. So now, Plaintiff and Class Members will likely also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15. Through this Complaint, Plaintiff seek to remedy these harms on behalf of herself, and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16. Plaintiff brings this class action lawsuit on behalf of those similarly situated, whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiff and Class members of the Data Breach. Defendant's conduct amounts to at least negligence and violates federal and state statutes.

17. Accordingly, Plaintiff sue Defendant seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, and (iv) unjust enrichment.

18. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## II. PARTIES

19. Plaintiff Susan Mack is and at all times mentioned herein was an individual citizen of Pennsylvania, residing in the city of Hoestead.

20. Defendant LNRS, is a Georgia-based domestic profit corporation with its headquarters located at 1000 Alderman Dr., Alpharetta, Georgia 30005; and principal place of business at 1105 North Market St. Suite 501, Wilmington, Delaware, 19801.[3]

21. Defendant can be served through its registered agent, CT Corporation System at 289 S Culver St, Lawrenceville, Georgia 30046.[4]

## III. JURISDICTION AND VENUE

22. This Court has jurisdiction over Defendant pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. the number of class members is more than 100 and at least one member of the class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23. This Court has personal jurisdiction over Defendant because Defendant is registered to business and maintains its headquarters in this District.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims emanated from activities within this district and the Defendant is registered as an entity in this District and has its headquarters in this District.

## IV. FACTUAL ALLEGATIONS

***DEFENDANT'S BUSINESS***

---

[3] Georgia Secretary of State, Corporations Division --available at: https://ecorp.sos.ga.gov/businesssearch/businessinformation?businessid=634220&businesstype=domestic%20profit%20corporation&fromsearch=true (last visited June 6, 2025)

[4] *Id.*

25. Defendant LNRS is a data broker that operates internationally helping companies in the financial, insurance, healthcare, and government sectors to assess risk and identity fraud. .[5] Specifically, Defendant is a data analytics provider that offers customers solutions to manage risk, make better decisions, and improve operations across various industries.[6]

26. In the ordinary course of business, Defendant's customers are encouraged and/or are mandated to provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as his or her:

a. name,

b. contact information,

c. Social Security number,

d. driver's license number and

e. date of birth.[7]

27. Defendant stored this Private Information in its information technology computer systems and servers, on information and belief located at its principal place of business in Alpharetta, Georgia.

28. Upon information and belief, Defendant made promises and representations to individuals', including Plaintiff and Class Members, that this Private Information collected from them would be kept safe and confidential, and that the privacy of this information would be maintained.

29. Likewise, Plaintiff and Class Members provided their Private Information to

---

[5] CPO magazine, Controversial Data Broker LexisNexis data Breach Impacts Over 364,000 People, Alicia Hope (June 4, 2025) – available at: Https://www.cpomagazine.com/cyber-security/controversial-data-broker-lexisnexis-data-breach-impacts-over-364000-people/ (last visited June 6, 2025).

[6] *About Us*, LexisNexis Risk Solutions, Inc. – available at: https://risk.lexisnexis.com/about-us (last visited June 6, 2025).

[7] *See* Notice of Security Breach (Exhibit A).

Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

30. As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties.

***THE DATA BREACH***

31. On December 25, 2024, an unauthorized third-party acquired certain data belonging to Defendant from a third-party platform used for software development.[8]

32. Defendant did not learn about the Data Breach until April 1, 2025.[9] In response, Defendant launched a review of the impacted data to determine what Private Information was compromised and to whom it belonged. [10]

33. On or about May 24, 2025, Defendant mailed Plaintiff a "Notice of Data Security Incident"[11] that stated in part:

> What Happened:
>
> On April 1, 2025, we learned that on December 25, 2024, an unauthorized third party acquired certain LNRS data from a third-party platform used for software development. The issue did not affect LNRS's own networks or systems. Based on our review of the impacted data, we have determined that certain of your personal information was affected.
>
> What Information was Involved:
>
> The types of impacted personal information varied by affected individual,

[8] Exhibit A
[9] *Id.*
[10] *Id.*
[11]

> and could have included name, contact information (such as phone number, postal or email address), Social Security number, driver's license number or date of birth. No financial or credit card information was affected. We have no evidence that your data has been further misused.

34. Plaintiff's notice letters were dated May 24, 2025—nearly 5 months after the Data Breach.

35. By obtaining, collecting and storing Plaintiff's and Class Members' PII, Defendant assumed non-delegable legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

36. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

37. Plaintiff and Class Members relied on this mutual understanding that Defendant would keep their PII confidential and securely maintained, to use this information for business purposes only, to make only authorized disclosures of this informatic, and to ensure that any vendor with whom Defendant shared the information was properly supervised and had the proper procedures in place to protect their PII.

38. Defendant had a non-delegable duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII, including any PII Defendant shared with any of its vendors, from involuntary disclosure to third parties; but Defendant failed to take the necessary precautions designed to keep the Private Information secure.

39. While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiff and Class Members.

40. Individuals affected by the Data Breach are, and remain, at risk that their data will

be sold or listed on the dark web and, ultimately, illegally used in the future.

***DEFENDANT'S FAILURES CAUSED THE DATA BREACH BECAUSE DATA BREACHES ARE PREVENTABLE***

41. Defendant admits that an unauthorized third party accessed Plaintiff and Class Members Private Information. Defendant failed to take adequate measures to protect individuals Private Information from unauthorized access.

42. The Private Information that Defendant allowed to be exposed in the Data Breach is the type of private information that Defendant knew or should have known would be the target of cyber-attacks given the substantial increase in Data Breaches in the industry sectors that Defendant operates in.[12]

43. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[13] Defendant failed to disclose that it could not reasonably safeguard individuals' Private Information.

44. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members.

45. Prior to the Data Breach, on information and belief, Defendant did not (i) ensure that its and/or its vendor's systems were encrypted or tokenized, (ii) ensure the deletion of such PII that it no longer had reason to maintain, (iii) eliminate the potential accessibility of the PII that was not justified, and (iv) otherwise review and improve the security of its network system that contained the PII.

46. Defendant could have prevented this Data Breach.

---

[12] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited June 6, 2025)

[13] *Protecting Personal Information: A Guide for Business,* Fed. Trade. Comm'n (Oct. 2016), -- available at: https://www.ftc.gov/business-=guidance/resources/protecting-personal0-information-guide-business (last visited June 6, 2025).

47. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[14] To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures: (i) an awareness and training program; (ii)strong spam filters to prevent phishing emails from reaching the end users, (iii) authentication of inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing; (iv) firewalls to block access to known malicious IP addresses; (v) patched operating systems, software, and firmware on devices; (vi) anti-virus and anti-malware programs to conduct regular scans automatically; (vii) privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary; (viii) configured access controls with least privilege in mind; (ix) disabled macro scripts from office files transmitted via email; (x) Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations; (xi) a ban on Remote Desktop protocol (RDP) if it is not being used; (xii) application whitelisting; (xiii) a virtualized environment to execute operating system environments or specific programs in; and or (xiv) data categories based on organizational value. and physical and logical separation of networks and data for different organizational units.[15]

48. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team,

---

14 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited June 6, 2025)

[15] *Id.* at 3-4.

the following measures: (i)secured internet-facing assets, (ii) thoroughly investigated and remediated alerts, (iii) included IT pros in security discussions, (iv) built credential hygiene, (v) applied the principle of least-privilege, and (vi) hardened infrastructure.[16]

49. Given that Defendant is such a large international company and was storing the Private Information of its hundreds of thousands of customers Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

50. Defendant could have been better prepared to identify a breach and immediately notify the victims of the Data Breach.

51. Defendant didn't discover the Data Breach until four months after it had occurred, which resulted in a five-month

***Value Of Private Information and the Impending Harm Caused by the Data Breach***

52. Victims of data breaches are perpetually susceptible to becoming victims of identity theft. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as the type of Private information disclosed in this Data Breach, namely, name, Social Security number, Driver's License number, etc.[18]

53. The Plaintiff and Class Members are now facing a substantial risk of identity theft after their identifying information, the Private Information, was compromised in the Data Breach.

54. Stolen PII of individuals has a high value to criminals and is often trafficked on the "dark web", a heavily encrypted part of the Internet that is not accessible via traditional search

---

[16] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed June 6, 2025).
[17] 17 C.F.R. § 248.201 (2013).
[18] *Id.*

engines.

55. Numerous sources cite dark web pricing for stolen identity credentials.[19] For example, Personal Information can be sold on the dark web at a price ranging from $40 to $200;[20] and criminals can purchase access to entire company data breaches from $900 to $4,500.[21]

56. Often times Law Enforcement has difficulty policing these crimes due to the encryption of the dark web, allowing users and criminals to conceal their identities and online activity in order to commit crimes over a long period of time.

57. Theft of PHI is gravely serious. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police at the expense of the victim of identity theft.

58. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

59. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

60. As a result of the Data Breach, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The

---

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last viewed June 6, 2025)

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last viewed June 6, 2025)

[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last viewed June 6, 2025)

Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; € the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private information, which remains in the possession of Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

61. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

62. Defendant disregarded the rights of Plaintiff and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions, (b) failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information, (c) failing to take standard and reasonably

available steps to prevent the Data Breach, (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and € failing. To provide Plaintiff and Class Members prompt and accurate notice of the Data breach.

63. The actual and adverse effects to Plaintiff and Class members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud, and/or medical fraud directly or proximately caused by Defendant's wrongful actions and/or inaction and the resulting Data Breach requires Plaintiff and Class members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiff and other Class members have suffered, and will continue to suffer, such damages for the foreseeable future.

***Defendant Fails to Comply with FTC Guidelines***

64. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

65. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security

problems.[22]

66. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

67. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

68. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

69. These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[22] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited JUNE 6, 2025).
[23] *Id.*

70. Defendant failed to properly implement basic data security practices.

71. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72. Defendant was always fully aware of its obligation to protect the PII and PHI of its customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Fails to Comply with Industry Standards***

73. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

74. Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

75. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

76. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation,

PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## V. DEFENDANT'S BREACH

78. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules related to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to train all members of Defendant's workforce effectively on the policies and procedures about PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304, definition of "encryption").

79. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

80. Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***Plaintiff and the Class Members Have and Will Experience Substantial Harm***

81. Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

82. The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

83. Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;
- The diminution in value of their PII;
- The compromise and continuing publication of their PII;
- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
- The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

84. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

85. The value of Plaintiff's and the proposed Class's PII on the black market is

considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

86. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

87. One such example of criminals using PII for profit is the development of "Fullz" packages.

88. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

89. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

90. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

91. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

92. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

93. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

94. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

95. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[24]

---

[24] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited JUNE 6, 2025)

96. The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;
- retaining payment card information only as long as necessary;
- properly disposing of personal information that is no longer needed;
- limiting administrative access to business systems;
- using industry-tested and accepted methods for securing data;
- monitoring activity on networks to uncover unapproved activity;
- verifying that privacy and security features function properly;
- testing for common vulnerabilities; and
- updating and patching third-party software.

97. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[25] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

98. Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PHI and PII and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[25] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited June 6, 2025 ).

99. Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft***

100. Data Breaches such as the one experienced by Defendant's customers and users are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

101. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

102. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

103. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

104. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social

---

[26] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited June 6, 2025,) ("GAO Report").

[27] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited June 6, 2025).

Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

105. Theft of Private Information is gravely serious. PII/PHI is a valuable property right.[28] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

106. Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[29] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

107. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.

---

[28] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[29] *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited June 6, 2025).

> Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

108. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

109. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

110. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[30] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

111. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[31] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number

---

[30] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited June 6, 2025).

[31] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 6, 2025).

[32] *Id* at 4.

was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

112. It is also hard to change or cancel a stolen Social Security number.

113. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

114. This data, as one would expect, demands a much higher price on the black market. The National Association of Healthcare Access Management reports, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information."[34]

115. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016—the same as a Facebook account. That pales in comparison with the asking price for medical data, which was selling for $300 and up.[35]

116. In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put

---

[33] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 6, 2025).

[34] Laurie Zabel, *The Value of Personal Medical Information: Protecting Against Data Breaches*, NAHAM Connections, *available at* https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information (last visited June 6, 2025).

[35] Paul Ducklin, *FBI "ransomware warning" for healthcare is a warning for everyone!*, Sophos (Oct. 29, 2020) *available at* https://news.sophos.com/en-us/2020/10/29/fbi-ransomware-warning-for-healthcare-is-a-warning-for-everyone/ (last visited June 6, 2025).

on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## VI. PLAINTIFF'S EXPERIENCE

117. Plaintiff Susan Mack is and at all times mentioned herein was an individual citizen of Pennsylvania, residing in the city of Hoestead.

118. Plaintiff provided Defendant with her sensitive PII to receive services. Plaintiff received notice of the Data Breach around May 24, 2025, informing her that her sensitive information was part of Defendant's Data Breach (Exhibit A).

119. Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

120. Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

121. Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

122. Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate her damages.

123. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among

other things, monitoring her accounts for fraudulent activity.

124. Even with the best response, the harm caused to Plaintiff cannot be undone.

125. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of her privacy.

126. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

127. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches

## VII. PLAINTIFF AND CLASS MEMBERS DAMAGES

128. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered inadequate identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

129. The credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendant places the burden on Plaintiff and Class Members by

requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

130. Defendant's credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

131. Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

132. Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

133. Plaintiff and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

134. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

135. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

136. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

137. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class

Members.

138. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

139. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

140. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

141. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from

compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

142. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

143. Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

144. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VIII. CLASS REPRESENTATION ALLEGATIONS

145. This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

146. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

147. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**All persons whose Private Information was compromised because of the December 25, 2024, Data Breach (the "Class").**

148. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

149. Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

150. This action satisfies the numerosity, commonality, typicality, and adequacy of requirements under FRCP 23.

151. Numerosity. In accordance with FRCP 23(a)(1), the Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff now, but Defendant has provided notice to the Office of the Maine Attorney General that the number includes at least 364,333 individuals.[36]

152. Commonality. In satisfaction of FRCP 23(a)(2), there are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and

[36] *See* The Office of the Maine Attorney General, Data Breach Notifications

regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant's conduct was *per se* negligent;

k. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l. Whether Defendant was unjustly enriched;

m. Whether Defendant failed to provide notice of the Data Breach promptly; and

n. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

153. Typicality. Pursuant to FRCP 23(a)(3) Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

154. Adequacy of Representation. As FRCP 23(a)(4) requires Plaintiff will fairly and

adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

155. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

156. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

157. This class action is maintainable under FFRCP 23 because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

158. This class action is maintainable under FRCP 23 because Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

159. Predominant Common Questions: Likewise, issues that will arise in this case are

appropriate for certification under FRCP 23 because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant failed to timely notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

g. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

j. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

k. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

l. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

m. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

n. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

o. Whether Defendant's conduct was negligent;

p. Whether Defendant's conduct was *per se* negligent;

q. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

r. Whether Defendant was unjustly enriched;

s. Whether Defendant failed to provide notice of the Data Breach promptly; and

t. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

160. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

161. Information concerning Defendant's policies is available from Defendant's records.

162. The plaintiff knows no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

163. Given that Defendnant had not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## IX. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

164. Plaintiff re-alleges and incorporates the above allegations from paragraphs 1 thorough 93 as if fully set forth herein.

165. Plaintiff brings this claim individually and on behalf of the Class Members.

166. Defendant knowingly required Plaintiff and Class Members to submit non-public personal information as a condition of entering into a contract for use of Defendant services.

167. By knowingly collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft.

168. Defendant also had a duty to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

169. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

170. Defendant's duty of care to use reasonable security measures consistent with industry standards, applicable standard of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that its systems and networks, those of its third-party vendors, and the personnel responsible for them, adequately protected individuals' Private information.

171. Defendant's duty arose because of the special relationship that existed between Defendant and Plaintiff and Class Members. Defendant was in a position to ensure that its systems, and the systems of third parties it provides sensitive information to, were sufficient to protect

against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

172. Defendant's duty to use reasonable security in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

173. Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members Private Information.

174. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

175. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information.

176. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and

prevent dissemination of Plaintiff's and Class Members' Private Information.

177. Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information within Defendant's possession might have been compromised and precisely the type of information comprised.

178. Defendant breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement proper data security procedures to adequately and reasonably. Protect Plaintiff's and Class members' Private Information. In violation of the FTC guidelines, *inter alia*, Defendant did not protect the Private Information it keeps; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks vulnerabilities; and failed to implement policies to correct security issues.

179. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

180. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

181. Defendant's br3each of duties owed to Plaintiff and Class members caused Plaintiff's and Class Members' Private Information to be compromised.

182. But for Defendant's failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

183. As a result of Defendant's negligence and breach of duties, Plaintiff and Class members are in danger of imminent harm in that their Private Information, which is still int he possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized, use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

184. Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

185. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and All Class Members)**

186. Plaintiff re-alleges and incorporates the above allegations from paragraphs 1 thorough 93 as if fully set forth herein.

187. Under the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

188. Section 5 of the FTC Act also prohibits "unfair...practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiff's and Class members' Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

189. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with industry standards.

190. Defendant breached its duties to Plaintiff and Class Members under Georgia law by failing to develop and implement policies and procedures necessary to protect Plaintiff's and Class Members' PII.

191. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach.

192. Class Members are consumers within the class of persons Section5 of the FTC Act (and similar Georgia state statutes) were intended to protect.

193. The harm that has occurred is the type of harm the FTC Act (and similar Georgia state statutes) were intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

194. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

195. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

196. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. The injuries include but are not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

197. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**THIRD COUNT**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and All Class Members)**

198. Plaintiff re-alleges and incorporate the above allegations from paragraphs 1 thorough 93 as if fully set forth herein.

199. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for entering into a contract for services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information, keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen, in return for the business services provided by Defendant. Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiff and Class members in its possession was secure.

200. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

201. Plaintiff and Class Members paid money to Defendant with the reasonable belief

and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

202. Implied in these exchanges was a promise by Defendant to ensure the Private Information of Plaintiff and Class members in its possession was only used to provide the agreed-upon reasons, and that Defendant would take adequate measures to protect Plaintiff and Class members' Private Information.

203. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure and implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

204. Thus, a material term of this contract is a covenant by Defendant that it would take reasonable efforts to safeguard that information. Defendant breached this covenant by allowing Plaintiff and Class members' Private Information to be accessed in the Data Breach.

205. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

206. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

207. The exchanges between Plaintiff and Class Members and Defendant constituted an agreement and meeting of the minds between the parties.

208. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class members would not have disclosed their Private Information to Defendant but for the prospect of utilizing Defendant services. Conversely Defendant presumably would not have taken Plaintiff and Class Members' Private Information if it did not intend to provide Plaintiff and Class

members with its services.

209. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

210. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

211. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members)**

212. Plaintiff re-alleges and incorporates the above allegations from paragraphs 1 thorough 93 as if fully set forth herein.

213. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of implied contract count above.

214. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

215. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendant.

216. Plaintiff and Class Members conferred a monetary benefit on Defendant. Defendant's acceptance and storage of Plaintiff's and the other Class members' Private Information created a fiduciary relationship between Defendant on the one hand, and Plaintiff and

the other Class members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its employees, clients, patients, and/or customers, which includes safeguarding and protecting Plaintiff's and the other Class members' Private Information.

217. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

218. Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

219. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

220. Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

221. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

222. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to

Defendant.

223. Plaintiff and Class Members have no adequate remedy at law.

224. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

225. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

226. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## X. PRAYER FOR RELIEF

227. WHEREFORE, Plaintiff, on behalf of himself and the Class described above seek the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and their counsel to represent the Class, and finding that Plaintiff are proper representatives of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 6, 2025

/s/

Ainsworth Dudley
Georgia Bar No. 231745
Adudleylaw@gmail.com
DUDLEY LAW, LLC
P.O. Box 53319
Atlant, Georgia 30355

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
**EKSM, LLP**
4200 Montrose Blvd. Ste 200
Houston, Texas 77006
Phone: (888) 350-3931

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice* forthcoming)

# EXHIBIT A

LexisNexis
RISK SOLUTIONS

Return Mail Processing
PO Box 999
Suwanee, GA 30024

206 1 41371 ******************AUTO**ALL FOR AADC 150
SUSAN R MACK
[redacted]

May 24, 2025

**NOTICE OF DATA BREACH**

Dear Susan R Mack,

LexisNexis Risk Solutions ("LNRS") provides risk management services to business customers. We are writing to notify you of an issue that involves certain of your personal information.

**What Happened?**

On April 1, 2025, we learned that on December 25, 2024, an unauthorized third party acquired certain LNRS data from a third-party platform used for software development. The issue did not affect LNRS's own networks or systems. Based on our review of the impacted data, we have determined that certain of your personal information was affected.

**What Information Was Involved?**

The types of impacted personal information varied by affected individual, and could have included name, contact information (such as phone number, postal or email address), Social Security number, driver's license number or date of birth. No financial or credit card information was affected. We have no evidence that your data has been further misused.

**What We Are Doing**

Upon learning of the issue, we promptly launched an investigation with the assistance of leading external cybersecurity experts, notified law enforcement and took steps to review and further enhance our security controls. We also initiated an extensive review of the impacted data to identify personal information that may have been affected.

**What You Can Do**

We recommend that you remain vigilant for incidents of fraud and identity theft by reviewing your account statements and monitoring your free credit reports. If you would like to check your credit report, you are entitled under US law to one free credit report annually from each of the three nationwide consumer reporting agencies. US residents can order a free credit report by visiting www.annualcreditreport.com or calling toll-free at 1-877-322-8228. The Reference Guide below provides recommendations by the US Federal Trade Commission on the protection of personal information. We also recommend that you remain alert for unsolicited communications involving your personal information.